[Cite as *In re A.M.*, 2017-Ohio-911.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| IN RE: A.M. | C.A. Nos. | 28348 |
|---|---|---|
| | | 28352 |

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 14 08 0533

## DECISION AND JOURNAL ENTRY

Dated: March 15, 2017

CARR, Judge.

{¶1}    Appellant, Samuel R. ("Father"), appeals from the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights to his minor child and placed her in the permanent custody of Summit County Children Services ("CSB").  This Court affirms.

I.

{¶2}    Father and Angela M. ("Mother") are the unmarried parents of A.M., born August 15, 2014.  Mother participated in the trial court proceedings and filed a notice of appeal, but did not file an appellate brief.  Accordingly, her appeal is dismissed.  *See* App.R. 18(C).

{¶3}    On August 18, 2014, CSB filed a complaint in juvenile court, alleging that A.M. was a dependent child based on concerns about Mother's substance abuse during her pregnancy as well as during a prior children services case involving an older child, S.H.  The agency obtained emergency temporary custody from the court. The father of A.M. was unknown at the

time. Subsequently, the trial court adjudicated A.M. to be a dependent child and granted temporary custody to CSB. The agency placed the child in the care of the same foster parents that had placement of S.H., Mother's older child. Mother's case plan focused on substance abuse, mental health, and basic needs. Paternity was established by genetic testing in September 2014. Father was incarcerated when the case began, but participated in key hearings by video teleconferencing or in person.

{¶4} During the following two years, Mother participated in the Family Reunification through Recovery Court ("FRRC"), which held bi-weekly meetings at the juvenile court. She engaged in counseling at the Community Health Center on two separate occasions for approximately three months each time. Her counselor testified that Mother had a long-term history of substance abuse, including the use of methamphetamine and opiates. The counselor stated that her treatment focused on relapse prevention, healthy decision making skills, and sober supports. Her major concern was Mother's ability to maintain sobriety outside of a structured environment. Mother also received CSB case management services. Father had a case plan as well, but was incarcerated for all but about two months of this proceeding and was scheduled for release approximately one year after the permanent custody hearing.

{¶5} CSB moved for permanent custody on January 25, 2016. Mother sought custody for herself. Father supported an award of custody to Mother or, alternatively, that A.M. be placed with friends or relatives. Following a hearing, the trial court terminated the parents' parental rights and placed A.M. in the permanent custody of CSB. Both parents filed notices of appeal, but only Father filed an appellate brief. Father has assigned five errors for review.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT'S DECISION DENYING FATHER'S MOTION FOR A SIX-MONTH EXTENSION OF TEMPORARY CUSTODY WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

{¶6}    Father claims that the trial court erred in denying his motion for an extension of temporary custody.  Pursuant to R.C. 2151.415(D), Father claims that such an extension would be in the best interest of the child, that Mother made significant progress on the case plan, and that there was reasonable cause to believe the child would be reunified with a parent or otherwise permanently placed within the period of an extension.  In support of his claim that Mother made significant progress on her case plan, Father asserts that Mother did well in visits with A.M., and engaged in counseling, mental health services, and substance abuse services.

{¶7}    The trial court denied Father's motion for several reasons, all of which we find to be well supported by the record.  First, the trial court found, contrary to Father's claim, that neither parent had established case plan compliance.  The record demonstrates that Mother had used illegal substances as recently as one week before the permanent custody hearing and she only had housing for three weeks, not long enough to be deemed stable.  Furthermore, Mother had not been visiting her daughter regularly in recent months and Mother acknowledged that that was due to her "active addiction."  The relatives named by the parents as potential custodians had no relationship with the child and had not made any efforts to visit her during this case.  No relative had moved for legal custody.  Finally, the trial court indicated that the case would shortly be two years old and the court was unable to extend legal custody long enough to permit Mother to demonstrate sobriety.

{¶8} Accordingly, the trial court did not err in denying Father's motion for an extension of temporary custody. Father's first assignment of error is overruled.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF THE MINOR CHILD TO SUMMIT COUNTY CHILDREN SERVICES BOARD WHEN THE SUMMIT COUNTY CHILDREN SERVICES BOARD DID NOT USE REASONABLE EFFORTS AT REUNIFICATION AND FINDING A KINSHIP PLACEMENT.

{¶9} Father claims that CSB failed to make reasonable efforts towards reunification of the family and cites three examples: (1) the agency did not take A.M. to visit Father in prison, (2) the agency did not fully explore a kinship placement with Mother's brother, and (3) the agency independently decreased Mother's visitation with A.M.

{¶10} Although, as CSB asserts, a trial court is not always required to make a *reasonable efforts determination* at the time of the permanent custody trial, *see* R.C. 2151.419(A)(1), the Ohio Supreme Court has emphasized that "[b]ased on the constitutional implications of terminating parental rights and the importance of requiring *reasonable reunification efforts* that pervades federal and Ohio law, * * * the State must have made reasonable efforts to reunify the family prior to the termination of parental rights." (Emphasis added.) *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 21. The *In re C.F.* court explained that the State's responsibility to make reasonable efforts to reunify the family is broad-based and "[n]o one section of the Revised Code addresses the concept of reasonable efforts." *See In re C.F.* at ¶ 29-31. Moreover, unlike the situation in *In re S.D.,* 9th Dist. Lorain, 2016-Ohio-1493, Nos. 15CA010864, 15CA010867, ¶ 25, cited by CSB, where neither parent preserved the challenge for appellate review, Father has preserved these matters for appellate review through motion or objection. We therefore address each example separately.

{¶11} First, Father briefly challenges the fact that CSB failed to bring the child to visit him in prison. At the time, CSB claimed that it lacked the resources to transport A.M. six hours to the prison. Notwithstanding the viability or advisability of taking an infant to a prison for parent-child visits, Father did not take advantage of his own opportunities to visit A.M. while he was out of prison. During those few months, Father attended two visits, no-showed for two, and cancelled two more. Furthermore, Father does not seek custody for himself, but rather with Mother or a relative. This argument lacks merit.

{¶12} Second, Father contends that the trial court failed to make reasonable efforts to further explore a kinship placement of the child with Mother's brother. Mother's brother had initially expressed interest in custody and was approved as a kinship placement. It is not clear, however, that any further exploration was necessary or appropriate. This is so because there was no evidence that Mother's brother had any prior relationship with A.M. or that he sought to develop one through visiting with A.M. during this case. Moreover, he did not file a motion for legal custody, as required by R.C. 2151.353(A)(3), and he did not come to court to testify that he desired custody. In addition, Mother's brother told the caseworker that they already had six children in their home and "their plates [were] full already[.]" After hearing about the agency's plan to place A.M. with her half-sibling, he told CSB that he was satisfied with that placement. There is no evidence that additional time would have made a difference. Father has not demonstrated error in the trial court's failure to extend temporary custody to further investigate placement with Mother's brother. This argument is without merit as well.

{¶13} Finally, Father argues that CSB acted improperly in independently reducing the length of Mother's court ordered visitation. In January 2016, Mother was having multiple overnight visits with A.M. each week. On January 20, 2016, CSB filed an amended case plan,

which changed her visitation schedule to one hour per week. According to the testimony of Mother's caseworker, the agency had held a "staffing" meeting and decided not to allow the last two weekend visits at Touchstone in January. Instead, shorter visits were offered at the visitation center.

{¶14} Mother filed an objection to the amendment of the case plan. According to Magistrate Esther Thomas, Mother "strenuously" objected to the amendments, argued that the agency was in violation of court orders, and claimed that the case plan amendments demonstrated bad faith and were not conducive to reunification. Magistrate Thomas indicated that she agreed with Mother.

{¶15} On January 25, 2016, a hearing was held before Magistrate Katharine Bertsch. At the hearing, all parties agreed that Mother had maintained her drug treatment, continued to have negative drug tests, and was soon due to be successfully discharged from Touchstone. CSB sought to explain the change in visitation by claiming that it was disturbed by the fact that Mother violated rules by taking A.M. to visit Father in early December while on a pass from Touchstone. The Magistrate disagreed, finding that CSB continued to facilitate the same visits for Mother without a reduction after that event, and that "[o]nce Children Services determined that the agency would be seeking permanent custody, however, the agency unilaterally reduced mother's visits." Magistrate Bertsch further indicated that instead of filing a motion to modify the existing visitation order, "Children Services filed a Notice of a Change in the Visitation plan, essentially re-asserting its authority to disregard previous court orders, and implement its proposed case plan amendment despite opposition by the mother."

{¶16} Accordingly, Magistrate Bertsch reminded CSB "of the current court order, and encouraged [the agency] to file any motions in support of [its] position[] so that all of the parties

have sufficient notice and opportunity to be heard" if the agency sought a change of the existing court order for visitation. The magistrate then specifically ordered that existing visitation orders issued by the court shall remain in effect pending further court order. The magistrate ordered Children Services to maintain the child's visitation with Mother from Friday morning until Monday morning each week, or as much of that visitation as is permitted by Mother's treatment center or supportive housing, pending further court order. Subsequently, Magistrate Thomas found that the agency had not complied with Magistrate Bertsch's January 25, 2016 order to adhere to the existing court-ordered visitation.

{¶17} A magistrate held a hearing to determine visitation after Mother moved to her new and less-structured residence on February 16, 2016. She ordered that Mother was to have supervised visitation a minimum of twice per week in two-to-four hour increments in the community or at her residence, commencing within seven business days. The record does not indicate that Mother objected to this order by the Magistrate, thus barring her from further assigning this as error on appeal.

{¶18} This Court has previously recognized that the procedures for the creation and amendment of a case plan are statutorily mandated, and that the terms of the journalized case plan bind not only the parents, but the state as well. *In re S.D-M.*, 9th Dist. Summit Nos. 27148, 27149, 2014-Ohio-1501, ¶ 26. *See also* R.C. 2151.412(F)(1). Any party may propose a change to a substantive part of the case plan, including the visitation rights of any party. *In re S.D-M.* at ¶ 27; R.C. 2151.412(F)(2). Proposed changes are to be filed with the court and notice must be provided to all parties as well as to the child's guardian ad litem by the end of the day following filing. R.C. 2151.412(F)(2). Such proposed changes are subject to timely objection, requests for hearings, and require the approval of the trial court before they may be implemented. R.C.

2151.412(F)(2)(a). ("The agency shall not implement the proposed change unless it is approved by the court.") *See also* R.C. 2151.412(F)(3) (regarding the procedure for proposing changes in the case of immediate danger.)

{¶19} Any action taken unilaterally by CSB in an attempt to alter Mother's visitation schedule was in violation of the court order. We are nevertheless unable to conclude that the resultant change in visitation, apparently covering only one weekend by the time the order was issued, was prejudicial to the overall custodial decision by the trial court in this case. Father's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN FINDING THAT IT IS IN THE MINOR CHILD'S BEST INTEREST THAT SHE BE PLACED IN THE PERMANENT CUSTODY OF SUMMIT COUNTY CHILDREN [SERVICES] AS THE PROSECUTION FAILED TO MEET ITS BURDEN OF PROOF AND THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶20} Through his third assignment of error, Father contends the finding of the trial court that permanent custody is in the best interest of the child is against weight of the evidence. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under

R.C. 2151.414(D)(1).  R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶21} The trial court found that the first prong of the permanent custody test was satisfied because A.M. had been in the temporary custody of CSB for at least 12 of the prior 22 months.  Father does not contest that finding, but rather challenges the finding that permanent custody is in the best interest of the child.  When determining the child's best interests under R.C. 2151.414(D), the juvenile court must consider all relevant factors, including the interaction and interrelationships of the child, her wishes, the custodial history of the child, and her need for permanence in her life.  *See In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11.  Although the trial court is also required to consider any relevant factors under R.C. 2151.414(E)(7) through (11), none of those factors applied to the facts of this case.  *See In re R.G.* at ¶ 11.

{¶22} The first of the best interest factors requires consideration of the relevant personal interactions and interrelationships of the child.  R.C. 2151.414(D)(1)(a).

{¶23} By her own testimony, Mother admitted to having multiple addictions since the age of 13, including heroin and methamphetamines.  She has struggled with her addictions since then, but stated that she was strongly motivated by her daughter to achieve sobriety so that she could secure custody of her.  Mother joined the voluntary Stars program and then entered the intensive inpatient Ramar program.  After 45 days, she moved to Touchstone, a very structured residential program, but which allowed her some freedom to have visitors and go shopping.

{¶24} Mother was also involved in mental health counseling at the Community Health Center, video counseling groups at Touchstone, on-site AA meetings, and had a "recovery coach."  Mother did well while residing in Touchstone and was able to have extended visits

there, including overnight stays, with A.M. They both enjoyed the visits and were affectionate with each other. The Touchstone coordinator observed them together and described Mother as attentive and "a good mom." The FRRC caseworker said Mother had great interaction with her daughter. The guardian ad litem testified that he had no concerns with Mother's interaction and believed Mother loved her daughter. They played together well, and there appeared to be a bond between them.

{¶25} However, when Mother was advanced to a less structured setting, she relapsed on amphetamines within three months. Mother returned to the structure of Touchstone where she again did well. However, when she moved to the less structured setting, she once again had a problem and relapsed on cocaine within one month. In addition, Mother stopped attending FRRC meetings, missed counseling sessions, stopped doing drug tests, and missed visits with her daughter. Her caseworker testified that from March 24, 2016, until the hearing on July 27, 2016, Mother had the opportunity for 25 visits and attended just six. The caseworker testified that members of Mother's service team tried to reach out to her during this time and tried to re-engage her, but met with little success. Instead, her caseworker testified that Mother slipped into a full relapse with binges on methamphetamines. Mother was discharged from her housing on March 24, 2016, and was discharged from FRRC on May 19, 2016 for non-compliance. A social worker from FRRC noted that one of Mother's difficult areas was her self-reported lack of family support.

{¶26} At the permanent custody hearing on July 27, 2016, Mother testified that in the last three weeks, she came to realize how much support she had and how many people cared about her. She also stated that she came to realize the need for treatment. Nevertheless, when she was asked about her most recent drug use, Mother indicated that she had used

methamphetamines and marijuana just one week prior to the hearing. When questioned about her lack of attendance at visitations since her discharge from FRCC, Mother acknowledged that it was because she was in "active addiction" and explained: "When you're out there in your addiction, you forget about everything. You don't care. You don't. You forget about everything that you need to do. It's like you're lost and confused and that's what I was. I was lost and confused."

{¶27} Mother did well when she resided in a very structured setting, but had been unable to maintain sobriety in a more open setting for any significant period of time. Mother's addiction and poor choices thus prevented her from being able to parent her child on a long-term basis. She did not demonstrate the sobriety that would have been needed to support awarding custody of her daughter to her, a child who at two years of age would be completely dependent on Mother and, if in active addiction, would place A.M. at risk of harm. Although Mother truly loved her child, after multiple failed treatment attempts and multiple relapses, Mother did not demonstrate that she was able to live a substance free lifestyle.

{¶28} In addition to Mother's substance abuse issues, she only maintained housing for three weeks, a length of time found by the trial court to be insufficient to establish stable housing for a two-year old child. Mother's source of income was bartending two nights a week and doing odd jobs. The trial court expressed concern as to whether Mother had the financial resources to care for A.M. The court also expressed concern that working in a bar might serve as a trigger to Mother's addiction.

{¶29} The facts in the record before this Court support the trial court finding that Mother was unable to meet her own needs or those of her child. Furthermore, the case was close to

reaching the two-year point and there was no additional time that could be offered to Mother to demonstrate that she could remain clean and sober.

{¶30} A.M. has no real relationship with Father. Father was incarcerated for A.M.'s entire life except for a few months following his judicial release and until he was incarcerated again. At the time of the permanent custody hearing, he had nearly a year left on his sentence. During Father's release from prison, he attended only two visits with his daughter although additional visits were scheduled.

{¶31} Father was also offered case planning services during his release from prison, but Father's caseworker at Oriana House testified that Father had "an overall lack of motivation" to be in the substance abuse program and tested positive for marijuana and amphetamines during that time. Father has not demonstrated that he can provide an appropriate home for A.M.

{¶32} There are no relatives that are able to assume custody of A.M. Only paternal grandmother visited A.M., and she is not able to assume legal custody. Over the course of the two years of this case, no other relative made any effort to establish a relationship with A.M. Nor has any relative filed a motion seeking legal custody, as required by R.C. 2151.353(A)(3), or even come to court to express a desire for custody.

{¶33} A.M. is closely bonded to her foster parents and the other children in that home, including her half-sibling who has been adopted into the family. Her foster parents hope to adopt A.M. also if permanent custody is granted. The caseworker observed A.M. during her monthly visits, and described her as very active and not yet verbal. She is comfortable in the foster home, with the foster parents, and with the other children in the home. The guardian ad litem said that her interaction in the foster home was "wonderful." He had no concerns with any interactions in that home.

**{¶34}** The guardian ad litem believes that an award of permanent custody to CSB is in A.M.'s best interest. A.M. is just shy of two years old and is not of suitable age and discretion to express her own wishes as to custody. *See* R.C. 2151.414(D)(1)(b).

**{¶35}** The guardian ad litem testified that he has had the same concerns for Mother throughout this case: sobriety, decision making, mental health, basic needs, stable housing, and income to meet basic needs. He also served as the guardian ad litem on the case involving Mother's older child, and he reported that the same issues that existed in the prior case have continued into this one.

**{¶36}** The guardian ad litem explained that Mother did well in very structured and restrictive settings. She was able to have extended and overnight visits there, but when she transitioned to a less structured setting and back to the community, she resumed substance abuse and made questionable decisions. He stated that Mother did not resolve the concerns that brought A.M. into custody. He was also concerned about her mental health (diagnosis of bipolar disorder) because that seems to have contributed to the substance abuse decisions she made.

**{¶37}** While he believes the best interest of the child lies in granting permanent custody to CSB, based on the testimony and his observations over the last two years, he also commended Mother for recognizing that she needed help and for how well she did in treatment. He hopes she continues to do well because she would have to take care of herself before she could take care of anyone else.

**{¶38}** The guardian ad litem explained that Father spent the majority of the case incarcerated and has a significant history of substance abuse. During the short period he was released from prison, he tested positive for amphetamines and marijuana and attended only two

visits with his daughter. He has several mental health diagnoses (paranoid schizophrenia, anxiety, and PTSD) but has not engaged in treatment services.

{¶39} The guardian ad litem noted that there have been nearly two years in which relatives could have come forward and sought custody, but none came forward to establish a relationship with A.M., and he believes the child would be traumatized to be removed from the only home she has ever known.

{¶40} The third of the best interest factors focuses on the custodial history of the child. R.C. 2151.414(D)(1)(c). Upon her release from the hospital following her birth, A.M. was placed in the emergency temporary custody of the agency. She has remained in the temporary custody of the agency and was placed with the same foster family that had adopted her older half-brother. She remained in the care of the same foster family for the remainder of the proceedings and for twelve or more months of a consecutive 22-month period. *See id.*

{¶41} As to the fourth of the best interest factors, there was evidence before the trial court that the child was in need of a legally secure placement. *See* R.C. 2151.414(D)(1)(d). Neither parent was able to provide a safe, stable home for the child. Moreover, there were no suitable friends or relatives willing to provide for A.M. Only the paternal grandmother had come forward to attend visits and develop a relationship with the child, but she was not in a position to assume custody of the child. Father had hoped that Mother's brother might be granted legal custody, but he had no relationship with A.M., did not file a motion for legal custody, and did not appear at the hearing to testify. Furthermore, he told the caseworker that "they had their plates full already with six children" in their home and that he was fine with A.M. being placed in the same foster home as her half-sibling. CSB contacted several other relatives. A number of

them had disqualifying situations and none pursued custody by filing a motion for legal custody or coming to court to testify.

{¶42} The record does not demonstrate that the trial court clearly lost its way and created a manifest miscarriage of justice in finding that it was in the best interest of A.M. to be placed in the permanent custody of CSB. *See Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. Accordingly, Father's third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF THE MINOR CHILD TO SUMMIT COUNTY CHILDREN SERVICES AS MOTHER HAD SUBSTANTIALLY COMPLETED HER CASE PLAN.

{¶43} Father contends that the trial court erred in granting permanent custody of A.M. to CSB because Mother substantially completed her case plan requirements.

{¶44} While parents' progress is measured in part by completion of their case plan goals, the case plan is not the only measure by which a court determines whether to grant a motion for permanent custody. This court has previously emphasized that substantial compliance with a case plan, without more, does not entitle a parent to custody. *In re M.Z.*, 9th Dist. Lorain No. 11CA010104, 2012-Ohio-3194, ¶ 19.

{¶45} Moreover, the evidence before the trial court demonstrates that Mother had not substantially completed her case plan and had not remedied the problems that caused A.M. to be placed outside of her custody. Mother's case plan addressed substance abuse, mental health, and the basic needs of the child. Mother did well in addressing substance abuse while she resided in a structured setting, but was unable to maintain a sustained period of sobriety while residing in a more open setting. The guardian ad litem expressed concern with Mother's efforts in addressing her mental health because he believed that contributed to the poor decisions she made regarding

substance abuse. According to Mother's stipulation to the facts in the complaint, Mother admitted that she did not take her bipolar medication for two years and attempted suicide three or four times. Additionally, Mother did not demonstrate an ability to provide for her own and her child's basic needs. She began sharing an apartment with another woman just three weeks prior to the permanent custody hearing, and planned to support herself by working part-time as a bartender and doing odd jobs, such as babysitting and "car work." The trial court expressed concern that working as a bartender might trigger substance abuse for Mother.

{¶46} A.M. is only two years old and would be completely dependent upon Mother for her care, safety, and security. Concerns remained regarding Mother's ability to meet her basic needs. Mother failed to demonstrate that she remedied the problems that caused A.M. to be removed from her and that she can provide an adequate permanent home for the child. Father's fourth assignment of error is without merit.

## ASSIGNMENT OF ERROR V

THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED FATHER'S RIGHTS WHEN TESTIMONY WAS PERMITTED OVER OBJECTIONS.

{¶47} Father claims that the trial court erred in permitting testimony regarding Mother's case involving her older child, S.H., over objection.

{¶48} During consideration of preliminary matters at the outset of the permanent custody hearing in this case, the court considered the admission of multiple exhibits. The court denied CSB's request to admit a certified copy of the court record in S.H.'s case, finding it to be irrelevant to the present case since that had been a voluntary surrender.

{¶49} Subsequently, CSB called as a witness, the individual who served as the caseworker in Mother's prior case and for the first few weeks of the present case. Mother's

attorney entered a general objection to bar the witness from testifying regarding the prior case, claiming it would be irrelevant. CSB responded that, although the prior termination was voluntary, it was important to show Mother's history of substance abuse. The court ruled that it would permit the caseworker to testify as to any treatment that was similar, and would consider the caseworker's testimony for the purpose of evaluating the progress that Mother had made or failed to make as it relates to chemical dependency, but not about legal outcomes in the prior case.

{¶50} Inter alia, the witness testified that she developed the initial case plan in the present case and that it included the same objectives as did the case plan in the prior case: substance abuse, mental health services, and basic needs. On appeal, Father claims the witness's statement that "[Mother] was not able to get [S.H.] back due to non-compliance" should not have been permitted because it unfairly prejudiced Mother's chance to gain legal custody of A.M.

{¶51} Upon review of the record, we observe that the parents had stipulated to the facts in the complaint at the time of the adjudicatory hearing. In so doing, they conceded that S.H. was adjudicated dependent and placed in CSB custody because Mother was unsuccessful in addressing her substance abuse and mental health objectives, and also that during that case, she abused pills and was discharged from the Community Health Center for non-compliance. The parents also agreed that after permanent custody was granted in the prior case, CSB advised Mother to address substance abuse in order to be able to parent her expected child, A.M., but Mother did not do so and she was not currently in treatment.

{¶52} To the extent that the parents' stipulations may not fully address Father's argument on appeal, we nevertheless conclude that Father has not demonstrated prejudice. Because this matter was tried to the court, there is a presumption that the trial judge considered

only the relevant, material, and admissible evidence in arriving at the judgment unless the record affirmatively demonstrates otherwise. *In re D.B.*, 9th Dist. Medina Nos. 03CA0015-M, 03CA0018-M, 2003-Ohio-4526, ¶ 9, citing *State v. Richey*, 64 Ohio St.3d 353, 357-358 (1992). Father has neither claimed nor demonstrated that the trial court relied on inadmissible evidence in reaching its decision. Accordingly, Father has not demonstrated prejudice. Father's fifth assignment of error is overruled.

### III.

**{¶53}** Father's five assignments of error are overruled. Mother's appeal is dismissed due to her failure to file an appellate brief. *See* App.R. 18(C). The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
DONNA J. CARR
FOR THE COURT

CALLAHAN, J.
<u>CONCURS.</u>

SCHAFER, P. J.
<u>CONCURRING IN JUDGMENT ONLY.</u>

**{¶54}** I agree with the majority that the trial court correctly terminated *each* of the parent's rights and granted permanent custody to CSB.

**{¶55}** As reported by the majority, A.M. was in the continuous temporary custody of CSB for well in excess of 12 of the 22 prior months and efforts to reunify the family were completely unsuccessful. Mother had long-term substance abuse concerns that she was unable to remedy despite substantial efforts and Father, who also had substance abuse issues, had had no prior relationship with the child and was incarcerated throughout most of the trial court proceedings and anticipated for a year afterwards. Significantly, although Mother filed a notice of appeal, she did not pursue her appeal by filing an appellate brief, thus resulting in dismissal of her appeal.

**{¶56}** Father did not seek custody for himself, but rather supported the now-dismissed claim of Mother or that of non-party relatives. Upon these facts, absent the constraints of local precedent, *e.g. In re A.S.*, 9th Dist. Summit No. 23456, 2007-Ohio-2195, ¶ 8-10, I would find that Father cannot assert error on Mother's behalf in an attempt to retain his residual parental rights, as Mother no longer has rights to which his attach. *See In re S.G.D.F.,* 10th Dist. Franklin

Nos. 16AP-57, 16AP-123, 2016-Ohio-7134, ¶ 14 ("An appellant cannot raise issues on another's behalf, especially when that party could have appealed the issues appellant posits.")  I would agree, however, that Father may assert error on behalf of a proposed non-party legal custodian, as he would retain his residual parental rights to the child in that situation

{¶57}  Accordingly, I concur in the result of the majority.


APPEARANCES:

DANIEL R. BACHE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.